Mr. Corrington. Good morning. I'm Thomas Corrington. I represent Santo Guerrera. Before we begin this motion to certify this question to the Louisiana Supreme Court, I think it's important that it does so. The Louisiana Supreme Court is the only court that can provide finality to this particular question. But they keep denying the question. Well, sort of, Your Honor. They haven't considered the question. They haven't considered it, but they keep denying petitions where they could. I agree with that, Your Honor. And that is why it's important because no court has addressed the underlying issues that I've raised in our case. If this court rules in favor of Mr. Guerrera, there's now a conflict with the Fourth Circuit. It affects a statewide industry and millions of ride shares per year. It is appropriate that such a decision comes from the Louisiana Supreme Court. So I urge, before this court rules, to certify this question to the Supreme Court. Now, the issue here is 45201.6. It is under the Transportation Network Company Motor Vehicle Responsibility Law. It clearly requires two types of insurance. Liability at a certain rate, depending on the stage. And it goes on to say, the policy that Uber must provide shall include uninsured motorist coverage to the extent required by 22-1295. They, Uber, interpret the last phrase, the extent required by 22-1295, to make a clearly mandatory statute optional. That, on its face, is an absurd result. You can't do that. You can't read a mandatory statute to be permissive. But their argument is premised on misunderstanding what 22-1295 does. 22-1295 does not create a right to reject uninsured motorist coverage. It creates an obligation on the insurance company. And then it creates a process by which insurers who don't otherwise have to carry uninsured motorist coverage have a process by which they can reject it. The rejection clause itself, so the very beginning of 22-1295, says the insurer shall include uninsured motorist coverage in the liability policy to an amount that is not less than the liability coverage. Then, the rejection clause that they rely on says, the coverage required under this section is not applicable if rejected by the insurer, or when rejected by the insurer. So note, that clause only becomes operational once the rejection form is signed. What it does is let the insurance company off the hook for providing uninsured motorist coverage when an insurer signs the rejection form. Well, and it saves the insurer some money. Well, absolutely. But the question before this court is, where does the right to reject uninsured motorist derive from? With other insurers, it derives from the fact that they don't have to carry it. You and me, taxi cabs, ambulances, tow trucks, common carriers, all have to provide a certain measure of liability coverage. But we have no responsibility or legal obligation to carry uninsured motorist coverage. So we get to reject it. All we have to do then is go through the process that 22-1295 provides. And if we fill out that form, the rejection clause in 22-1295 says, the coverage required by this section is not applicable if rejected. But Uber is in a different position. They, along with car sharing, because it's not unique. They, along with car sharing and transporters and railroad workers, are legally obligated to provide uninsured motorist coverage. The legislature has decided that these three activities require both liability and uninsured motorist coverage. It is clear and unambiguous in the statute. So they have no right. Before you get to the rejection form, before you can fill it out and make the rejection clause of 22-1295. So for what purpose did the legislature include the reference to that other provision? It's very clear, Your Honor. To make it in context, the sentence before, it says liability and an amount. $5,100 during stage one, $1,000,000 during stage two. Doesn't it make sense that then when they require uninsured motorist coverage, they say how much? That is what the reference is for. Because 22-1295 requires uninsured motorist to be not less than the liability limit. And this language actually has flexibility to it. Not only does it automatically change from stage one to stage two, where the uninsured motorist has to match the liability limits. But these are minimum limits. If an Uber driver, and you may have been in a big limo that's run by a limo company on Uber Black, if they decide that they want to provide more liability coverage, this language automatically requires that their uninsured motorist coverage equal or not be less than the liability limits. They just chose a different way to phrase how much. And you can look at just the language. Shall include uninsured motorist coverage. Well, how much? To the extent required by 22-1295. Well, but the problem is the very first section of 1295 gives the opt-out to insureds. Uber would be the insured here. It absolutely does not, Your Honor. 22-1295 creates a process. There's no opt-out in 22-1295. 22-1295 first requires insurers to include uninsured motorist and liability in the liability policy. Then the clause. But the insurers don't have to provide it when the insureds reject coverage, select lower limits, or select economic-only coverage. Exactly. As long as they follow subsection 2. I mean, I just, I don't see, where's the support for separating out this statute with regard to the ride-sharing, I mean, I'm sorry, the TNCs, versus nobody else? Everyone else, but there's three. It's not just ride-sharing. It's ride-sharing, car-sharing, and transporters of railroad workers. These three statutes require these particular actors to provide uninsured motorist coverage and liability coverage. Everyone has to have it. But what we're talking about in terms of the revised statutes 45-201.6 applies to the transportation network drivers and transportation network companies. Yes. Not car share or railroad workers. No. Those are different statutes. They are different statutes, Judge. But the other statutes of the insurers who can reject uninsured motorist coverage, they have no obligation under the law. That's why they can't. We have to step, before we get to the filling out of the form, there is no dispute in this case that they filled out the form. Where does the right come to fill out the form to begin with? That is what the distinction is here. Most insurers, and that's what they're trying to be a part of, everybody else, they should be able to reject uninsured motorist like everyone else. Everyone else except for TNCs, car-sharing, and railroad transporters, everyone else doesn't have to provide or doesn't have to carry uninsured motorist. That's why they get to reject it. These three don't because they have to provide it to engage in the activity. You don't have to do ride-sharing. You don't have to do car-sharing. But if you do, the statute says you must carry liability and uninsured motorist coverage. But taxi drivers have to have it. They do not. They can opt out. Exactly, because they don't have to have uninsured motorist coverage. And look, we can go through all the policy reasons why this is the case. But we don't have to because the statute directs us and says to the extent required by 1295. But, right, the 12, 22-1295 does not provide the right to reject uninsured motorist. It provides the process. I don't know how to read it any other way. It says the insurer doesn't have to have it if they opt out. That is not what 22-1295 says. Okay. It says, first it says that the insurance company has to provide uninsured motorist in the liability policy, right? Then it goes on to say the coverage required under this section is inapplicable if or when rejected by the insurer. So, yes, when that form is filled out, they don't have to provide it. The problem is you don't get to. If you're legally required to have it, you don't get to reject it. If you're legally required to have it to the extent that this statute says you have to have it, which is you can opt out if you follow subsection Romanet 2. That's not what it says, Your Honor. It doesn't say that you can opt out. It doesn't say that. Otherwise, everyone could opt out. And that's not what it says. It says the opt out. In fact, there is no opt out. There is no right. There is no legal reason that you have to have it for several insurers like taxicabs. They don't have to have uninsured motorist coverage so they can opt out. That is the difference. These other three are legally obligated by statute to carry the coverage. And when you say that the TNCs are legally obligated, is the ground for that 452016? Yes. And the reference to 221295 is strictly the amount that they must cover. But that's not what it says. It says to the extent required by, they shall include uninsured motorist. To the extent required by 221295. So what is the extent that 221295 requires that you provide uninsured motorist, that it equal the liability limits? But that's not what it says. I mean, I was only in the legislature for a little while, but I'm not sure how else we would reference the statute and basically incorporate it other than the language that they use here. As it's written, you can't create a right to reject uninsured motorist that isn't in 221295. It doesn't say you can reject uninsured motorist coverage. It says the insurer's obligation to provide it is not applicable if it is rejected. Is your position that Uber is an insurer? No. That's exactly their insurer. That's the point, is that insurers are most insured. There's a legal distinction here, Judge. There's a legal distinction between insurers who don't have to provide uninsured motorist coverage and those that do. And that is the difference. It must be recognized. If we do a statutory analysis, every question that a court would ask militates in favor of there being UN coverage. You know, if it only pertained to the amount, why couldn't 201.6 have plainly said the amount? Because there's flexibility. It could have, Your Honor. Absolutely, it could have. And 32900.1 does. But also, 221300.3, which applies to car sharing, it has a similar approach. It approaches, it references 32951 as the statute that the UN must at least adhere to. But does that statute allow an opt-out by insurance? No, there's no opt-out at all. That's the point, is that they're legally required to have it. And you cannot create a right to reject if they haven't had it. You have a conflict there. How do you require an insurer to have something and say you don't? That's not how legislatures work. Oh, I think you overestimate or underestimate legislatures. Well, no, they create exceptions, Your Honor. It says in 1295 that any insured named in the policy can reject coverage. Yes. You're saying there's no right to reject. I'm not sure how else to read that. How does any insured not include the Uber driver or Uber, the transportation network company? Because they, there's a distinction between those who have to have uninsured motors to engage in the activity they're doing. If you allow them to reject the uninsured motorist coverage, then that is half the statute or the protection that the legislature gave. This is clear and unambiguous that they shall include uninsured motorist coverage. There is another way to read, to the extent required by 22-1295, which maintains the mandate, they make it superfluous. But it reads out of existence the other part of 22-1295 that allows any insured to reject the coverage. Not if you recognize that the insurers they're talking about are the insurers that have the right to reject because they don't have a legal obligation. You're reading all that into the statutes. I'm not, Your Honor. What do you do with section B-1 of 45-201.6? Because that actually spells out the limits of death and bodily injury coverage and those sorts of things. It actually specifies it. Right. Well, those are the coverages. But who can reject it? The rejection clause only applies after the form has been signed. The coverage required under this section is not applicable when rejected by the insured. But if the insured doesn't have a right to reject it to begin with, they can't sign the form. In this case, there are insurers who have the right to sign it because they're not legally obligated to provide it. But because these three other insurers, and this distinction has to be recognized, Your Honor, there is a distinction between insurers who have to have uninsured motorists and those that don't. And that's where we are. And if you do a statutory construction analysis, all of the questions, does their reading of the statute make the U.M. mandate worthless? It does. They admit it. Every question. The purpose of the statute is to protect users of TNC services. If you allow them to reject it, there is no protection. So my time is up. All right. You have time for rebuttal. Mr. Flanagan. May it please the Court. Thomas Flanagan for Uber and Wazeer. In deciding whether to require TNCs to have uninsured motorist insurance in 2015, the legislature decided not to reinvent the wheel. It passed a bill that is relevant here, adopted existing law, section 1295, and that existing law made U.M. coverage the default rule but expressly empowered insurers to waive or change that coverage if they wanted to. By effectively copying and pasting that law, the legislature made U.M. coverage optional for TNCs just like it's optional for taxicabs. No court has ever disagreed with that common-sense reading of section 201.6. I'd like to do a few things this morning. First, talk about the provision that has been incorporated into the TNC law. Second, talk about the drafting history of the TNC law in 2015. And finally, address the claimant's color options. The law, as has been discussed, requires U.M. but only to the extent required by section 1295. And so, of course, we need to look there. 1295 has been around as long as I've been around. It's about 60 years old. It's heavily litigated, heavily explored. And so the legislature adopted a known quantity when it adopted section 1295. Now, the statute contains some 25 sections and subsections. It goes on for quite a while. The very first clause of the very first sentence of the very first subsection says U.M. is required in auto liability policies. And if we stopped at the semicolon, we wouldn't be here. But it goes on for pages and pages. And as we look just after the semicolon, we see that the insured can do a number of things. They can decline U.M. entirely. They can choose lower limits. They can keep it or they can take what's called economic only U.M. Give up basically a right to sue for pain and suffering. So many choices. The plaintiff's theory presumes that in section 201.6, the legislature adopted 1295 but only the first clause of the first sentence and stopped there. That's frankly an unreasonable reading, especially in light of the statute so heavily litigated. And so much of the litigation about 1295 is about this notion of waiver. Did this insurer truly wait? Did they check the right box? Did they wait for themselves and their company? We've had one court called it a wave of waiver litigation. That's what they adopted. Now, the plaintiff would rewrite the law. He says that the gist of the law is, and I quote, that TNCs shall provide U.M. coverage that is not less than the limits of the bodily injury liability coverage. Well, that would have been a pretty simple thing to put in the statute if, in fact, that is the case. The bodily injury liability coverage is $1 million. So the legislature could have said you need at least 1 million of U.M. But, of course, that's not what they said. Turning to the legislative history and the drafting of this particular bill, the legislature was for a U.M. mandate before they were against it. There was a draft of this bill in the Senate, Senate Bill 172, that said U.M. coverage shall be $1 million. And then that language was amended and deleted out and, in its place, adopted the language to the extent required by the U.M. statute, section 1295. So the fact that the legislature considered and even had a draft embracing the plaintiff's view, only then to amend it out as part of the legislative process, firmly shows that this, in fact, was no accident. There is no U.M. mandate. Now, opposing counsel refers to other laws. One of them, who knew we had a law regulating insurance for those who transport railroad workers, but we do. And that's in Title 32, section 900.1. And it says that those who transport those workers must have at least $500,000 of U.M. coverage. Well, that's completely different from what we have here. There's no adoption there of section 1295. There's no reference to the ability to opt out, no incorporation of that preexisting, heavily litigated statute. So the legislature knew how to impose a U.M. mandate when it wanted to. It did so in Title 32. It did not in Title 45. The plaintiff parses the statutory language without mercy. And most of the time, he begins with the premise that he cannot be dissuaded from, there is an unwaivable U.M. mandate. And from that proposition, anything that would suggest there's not, he would say, well, that's inconsistent with my premise. There is a U.M. mandate. There is no daylight between 201.6 and 1295. They are not independent. They are as dependent as can be. 201.6, as per U.M., has no content of its own. The legislature simply said, go look to section 1295, and that's your answer. So the idea that there is an unwaivable mandate in one but a waivable mandate in the other simply doesn't hold purgeance. And second, the counsel says as well that we would render the statute meaningless. That's not correct. Again, and I think it's explained by the legislative history, there was a place for section C in the draft. And section C did have a U.M. mandate, and the legislature rejected it. It was a unanimous vote, by the way, in the Louisiana Senate to reject that mandate. Counsel suggests that there ought to be a certification of this question to the Louisiana Supreme Court. As Judge Wilson pointed out, they denied risk twice. So they've exercised their discretion. They did not want to consider it. But as the court said just some months ago in a case called Williams v. Go Auto, the mere fact that there may be some question that the Supreme Court hasn't decided a question isn't enough to warrant certification. There is a burden on folks. There's a burden on parties. But in the traditional analysis this court looks at on certification, question one is the closeness of the issue. And I would respectfully submit it's not a close question here. Again, no court has agreed with the plaintiff's interpretation of this statute. So I will save some time for the court and my colleague and simply ask this court to affirm. Thank you. All right, sir. Thank you. Mr. Giordano. Good morning, Your Honors, and may it please the Court. My name is Chuck Giordano, and I represent United Financial Casualty Company. I'll be very brief. We've already established that in order to reject U.M. coverage, you have to follow certain criteria under 22-1295. U.M. coverage, as you, Your Honors, have pointed out, is written into every policy unless the insurer rejects that coverage. In this case, the U.F.C.C. has a fully completed state promulgated form. The form was provided to Rezier by U.F.C.C. as required by statute. It was signed by U.F.C.C.'s legal representative, Amy Wagner. And for that reason, Your Honors, there's no U.M. coverage under the U.F.C.C. policy. And we adopt all of the arguments that have been made today by the Uber party. Thank you. All right, sir. Thank you. Do you have any questions? No, sir. We appreciate brevity. Thank you. I will agree with my opposing counsel to one point, is that the legislature knows how to write the U.M. mandate. They've done it over and over again with insurers who are not obligated to provide U.M. coverage. That allows them to reject it. If they wanted Uber or GNCs to be able to do the same thing, they would have just said a certain liability limit, just like they've done for tow trucks and ambulances and everyone else, and left it there. Then they would be able to reject uninsured motorist coverage because U.F.C.C. would have to come in, offer them more uninsured motorists, anyway, under 2212.5, and they would clearly be able to reject it. They didn't write the statute that way. They put in a U.M. mandate for a reason, and that reason is to protect users of TNC services. There's another interpretation other than this. We're serving that interpretation. Isn't civil law even more demanding than our common law about the interpretation of statutes and the court's ability to revise or rewrite them? But you're not. Yes, you're absolutely correct, but you're not rewriting. You're giving an interpretation of the term to the extent required by 2212.95. I've given you a reasonable interpretation, not rewriting the statute. A reasonable interpretation is that they looked at 2212.95 to tell them how much U.M. to provide, to the extent required by, not you can't. They wrote the statute and put in a U.M. mandate that must be given notice. It's not a waivable U.M. mandate. Otherwise, they wouldn't say you shall have it. They would just say you only have to put up a million dollars of liability coverage. Well, Mr. Flanagan made the point that the legislature rejected putting in a mandate. No, they rejected a particular amount, Your Honor, because New Orleans had written it three months before, and their U.M. statute still says they have to have U.M. of a million dollars. New Orleans contingency did not go up to Baton Rouge and vote on a law that was in conflict of their own. They just wrote it in a different way. Now they have flexibility. It has to be, because they also, in New Orleans, they don't require U.M. for just the driver alone. State law does. So to automatically change, it's a flexible phrase. At 5100 during Stage 1, they have to provide 5100 of U.M. And during Stage 2, they have to provide a million. But to basically talk about rewriting the statute, you're weeding the U.M. mandate completely out. Because if there wasn't a U.M. mandate at all, they would get to reject uninsured workers. Absolutely. But there is. It can't be the same result. They wouldn't have put it in there. It's there for a reason, and if you go through a statutory construction analysis, what's the purpose of the law? To protect TNC users, not them. Does a particular interpretation render a passage meaningless? Theirs does. My interpretation maintains the mandate. It maintains the mandate. It furthers the purpose of the statute. There's a construction clause, 45201.12, which requires a court to construe the language of the statute in favor of TNC users, not them. And this is, so we have a phrase, and I'm like, okay, what does this phrase mean? I've given you a reasonable interpretation. It furthers the purpose. It maintains the mandate. It maintains the construction that must be applied. It harmonizes the state law with the city law. That is required if able to do so. There is a clear ordinance. The state doesn't have to harmonize its law with the city's law. We do. The state supersedes the city's law. Absolutely it does. If there is an actual legal conflict, Your Honor. But if it is read in the way that they have to provide uninsured motorist coverage at state level, then it is harmonized with the city. We as lawyers and judges have to try to find a harmony if it exists. Do we? That's the rule. Between state law and the city ordinance? If there is a way to harmonize them, yes. Now, if there is a flat-out contradiction that says, no, we do it this way and you do it that way. But I thought the Louisiana courts had basically said there was a flat-out contradiction. In New Orleans, this law was inoperative. No, they cited a case that dealt with minimum wage law. And the rules were different. This is not different. There is a state law that requires them to provide U.M. coverage, and there's a city law that requires them to provide U.M. coverage. If that is U-harmonized, though, it would be impossible. So I believe my time is up. Do you have any more questions from the court? No. It's very interesting. Thank you. Thank you. Court will be in recess until tomorrow morning.